IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) MARLON DREW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.___26-cv-00141-CDL_____ |
| vs. | ) | |
| | ) | JURY TRIAL DEMANDED |
| (1) CITY OF TULSA, OKLAHOMA, | ) | ATTORNEY LIEN CLAIMED |
| (2) OFFICER TYLER HOFTENDER, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

**COMES NOW** the Plaintiff, Marlon Drew ("Plaintiff" or "Mr. Drew"), and for his Complaint against the Defendants, alleges and states, as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Marlon Drew is a resident of Tulsa County, Oklahoma.

2. Defendant City of Tulsa ("City" or "Defendant City"), Oklahoma is a municipality located in Tulsa County, Oklahoma. The City provides and employs the Tulsa Police Department ("TPD").

3. Officer Tyler Hoftender ("Officer Hoftender") was at all times relevant hereto a police officer employed by TPD. At all pertinent times, Officer Hoftender was acting within the scope of his employment and under color of State law. Based upon information and belief, the Officer Hoftender was a resident of Tulsa County, Oklahoma at the time of the incidents described herein.

4. The jurisdiction of this Court is invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourth and/or Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

1

5.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

6.     Paragraphs 1 through 5 are incorporated herein by reference.

### A.  Facts Specific to Plaintiff

7.     On March 12, 2024 at approximately 9:45 a.m., Defendant Officer Tyler Hoftender was dispatched to the YMCA located at 5005 S. Darlington Ave. in Tulsa, OK.

8.     At the time, Plaintiff Marlon Drew was lifting weights at the YMCA gym.

9.     A YMCA employee, Elizabeth Paz, had called 911 claiming that the Mr. Drew was "not cooperating" and was "disrupting the gym."

10.     In reality, Mr. Drew had done nothing to "disrupt" anyone at the gym.

11.     Shortly after the 911 call, Officer Hoftender and TPD Officer Foust arrived at the YMCA gym.

12.     They asked Mr. Drew to leave the premises, but he asked to finish his workout, as he was a member and had done nothing wrong.

13.     When Mr. Drew said that he should be able to finish his workout, the Officers notified Mr. Drew that he was under arrest for trespassing and obstruction.

14.     The commanded Mr. Drew to place his hands behind his back, which he did. At the time, Mr. Drew was standing in the middle of the weight room, back turned to the officers with his hands out and behind his back, showing them he was unarmed and complying with their commands.

15.     Then, Officer Hoftender suddenly approached Mr. Drew, grabbed his wrists, forced Mr. Drew's hands completely behind his back, and began walking him towards the mirrored wall of the gym.

16. Officer Hoftender then commanded Mr. Drew to get on his knees, and he again complied.

17. Next, Officer Hoftender pushed Mr. Drew from behind, sending him onto the floor on his stomach.

18. When Hoftender roughly and unnecessarily pushed Mr. Drew onto the floor, Mr. Drew informed the Officers that he had recently broken his neck. Indeed, Mr. Drew was recovering from a fractured cervical vertebra.

19. A bystander recorded the interaction on his cell phone, and he also told the Officers not to "rough [Mr. Drew] up," as he had a broken neck.

20. The Officers then handcuffed Mr. Drew without incident.

21. The Officers left Mr. Drew handcuffed on the floor with Hoftender kneeling on top of him for a little over a minute. They searched him and found no weapons or contraband of any kind.

22. Officer Hoftender then rolled the handcuffed and subdued Mr. Drew to a seated position, with his back to the mirrored wall, which was just a couple of feet behind them.

23. The Officers then commanded Mr. Drew to stand up. Mr. Drew, still handcuffed, used his feet to push himself up to a standing position. While standing, Mr. Drew stumbled a bit on some plastic workout equipment behind him.

24. Officer Hoftender then forcefully grabbed the handcuffed and compliant Mr. Drew by the face and violently smashed his head and neck into the mirrored wall.

25. This was excessive and objectively unreasonable force.

26. The force aggravated Mr. Drew's previous neck injury, and he has required significant medical treatment due to Hoftender's excessive force.

27.     At all pertinent times, Mr. Drew was unarmed, compliant, not resisting, and posed no threat to the Officers or anyone else.

### B. Facts Pertinent to the Existence of Municipal Policy or Custom

28.     TPD has a pattern of using unnecessary and excessive force on civilians, especially those who are not suspected of serious crimes and are not fleeing or resisting.

#### ■ Ira Wilkins Incident

29.     For example, on February 5, 2017, TPD officers encountered Ira Lee Wilkins ("Mr. Wilkins") while he was sitting in his parked car at Jackie Cooper Imports of Tulsa, at 9393 South Memorial Drive in Tulsa, OK.

30.     One of the officers on the scene, Officer E. Rangel, had activated his body camera, which captured the entire interaction between Mr. Wilkins and the TPD Officers.

31.     Officer Will Mortenson ("Officer Mortenson") walked to Plaintiff's car and yelled at him to turn off the radio.

32.     Mr. Wilkins complied with this order and remained seated in his car.

33.     Officer Mortenson then ordered Mr. Wilkins out of his vehicle and, again, Mr. Wilkins complied.

34.     Officer Mortenson then turned Mr. Wilkins around so his back was facing the officer and pushed Mr. Wilkins against his vehicle.

35.     Next, Officer Mortenson pulled Mr. Wilkins's hands behind his back, handcuffed him, and began frisking him. Another Officer, Angela Emberton ("Officer Emberton") stood just inches away from Mr. Wilkins.

36.     As Officer Mortenson was searching Mr. Wilkins, he asked Mr. Wilkins to identify himself. Mr. Wilkins slightly hesitated and Mortenson yanked back on the handcuffs and then forcefully pushed Mr. Wilkins up against his car.

37.     Mr. Wilkins then asked why the officer was using so much force on Mr. Wilkins's wrists. Mortenson responded by threatening Mr. Wilkins with additional harm while the other officers on the scene can be heard laughing in the background. Emberton can be seen grabbing Mr. Wilkins's right arm at this point.

38.     Mr. Wilkins again asked why Mortenson was exerting so much pressure on Mr. Wilkins's wrists, to which Mortenson responded that he needed to get into Mr. Wilkins's back pocket.

39.     The two officers then began to yank on Mr. Wilkins's arms and Mortenson yelled at Mr. Wilkins to "quit." Mr. Wilkins then asked what he was supposed to be "quitting."

40.     Approximately five seconds later, Officers Mortenson, Emberton, and Rangel forcefully took Mr. Wilkins to the ground.

41.     Mr. Wilkins began pleading with the officers to stop and that they were breaking his wrists. A voice from one of the officer's radios then asked if the officers had "spray," and when the officer responded in the affirmative, an order was given to "spray him," despite the fact that Mr. Wilkins was compliant, not resisting, in handcuffs and subdued with three officers on top of him.

42.     Mr. Wilkins continued pleading with the officers, who told him to "stop it." A "spraying" sound is then heard as Mr. Wilkins was doused with pepper spray.

43.     Mr. Wilkins then began wailing in obvious distress as a result of being sprayed with pepper spray.

44.     Officer Rangel then told the other two officers to turn Mr. Wilkins on his side and Mortenson continued searching Mr. Wilkins's pockets. Mr. Wilkins very slowly rocked back and forth on his side, in obvious pain, to which one officer responded by asking Mr. Wilkins if he "would like more spray?" Mr. Wilkins said that he did not, and the officer taunted Mr. Wilkins by again asking, "do you want more spray?"

45.    The officers then left Mr. Wilkins writhing on the ground in obvious pain and distress while they called EMSA.

46.    Mr. Wilkins continued lying on the ground in complete silence, seemingly unconscious. He was so incapacitated that Mortenson asked Rangel if Mr. Wilkins was still breathing.

47.    At this point Rangel told Mortenson that the officers "had to get [Mr. Wilkins] compliant one way or another, but he just kept fighting us," despite the fact that Mr. Wilkins had never resisted the officers' demands.

48.    The Tenth Circuit held and reasoned that a reasonable juror could find that the force used on Mr. Wilkins was excessive. *See Wilkins v. City of Tulsa, Oklahoma,* 33 F.4th 1265 (10th Cir. 2022). The City of Tulsa reached a settlement with Mr. Wilkins after the Tenth Circuit's opinion.

■ **Joshua Harvey Incident**

49.    On August 24, 2018, TPD Officers Tased Joshua Harvey approximately 25 times within three minutes, killing him.

50.    Body Worn Camera ("BWC") video showed the unarmed and compliant Harvey Tased over 20 times while he was on the ground, completely subdued.

51.    BWC video also showed TPD officers forcefully holding the handcuffed and subdued Mr. Harvey on the ground, face down, for approximately 15 minutes.

■ **James Weigant Incident**

52.    On August 25, 2019, James Weigant went to the Gas N Grub convenience store located at approximately 36th and Harvard in Tulsa to buy some items.

53.    Mr. Weigant was refused service by the employee, Brandon Whitebook, and told to leave.

54.    Mr. Weigant agreed to leave, but Whitebook nonetheless sprayed him at close range with OC spray (pepper spray), temporarily blinding him.

55.    Mr. Weigant walked out into the parking lot and attempted to clear his eyes of the OC spray.

56.    Whitebook had called 911, and TPD Officer Greg Comfort soon arrived on the scene.

57.    When Officer Comfort arrived, Mr. Weigant was sitting in the parking lot, still blinded.

58.    Officer comfort proceeded to blast Mr. Weigant *again* with OC spray, despite the fact that he was subdued, unarmed, compliant, and nonthreatening.

■ **Easker Brooks Incident**

59.    On or about March 29, 2020, TPD Officer Cherish Comfort used excessive force on Easker Jame Brooks, III ("Mr. Brooks").

60.    Just prior to the use of force inident, Mr. Brooks had been watching TV at his home with his girlfriend, a woman named Sierra Romo.

61.    Officer Comfort had been dispatched to Mr. Brooks' home after Ms. Romo's mother, Melissa Fish, called 911. Ms. Fish, who did not like Mr. Brooks, made numerous false claims about Mr. Brooks to the dispatcher.

62.    Officer Comfort exited his police vehicle with his gun drawn. When he arrived, Mr. Brooks was standing on his front porch.

63.    Officer Comfort then ordered Plaintiff to get on the ground.

64.    By this point, Officer Comfort had not identified himself or what his business was at Mr. Brooks' location. Officer Comfort did not state whether Mr. Brooks was under arrest or detainment or whether Mr. Brooks was even suspected of any crime.

65. Officer Comfort moved towards Mr. Brooks and struck him in the chest with his left hand, knocking him to the ground. Comfort still had his firearm in his right hand.

66. Once Comfort had Mr. Brooks on the ground, lying on his stomach, he holstered his weapon and struck Mr. Brooks with his fist on the side of his face/head at least three times.

67. At the time, Mr. Brooks was not resisting, posed no discernable threat and was attempting to put his hands behind his back as ordered by Officer Comfort.

68. After the three strikes to Mr. Brooks' face, without justification, Officer Comfort employed a grappling or wrestling hold, referred to as a "C.H.U.R.C.H. hold", on Mr. Brooks in an apparent attempt to inflict injury and harm to Mr. Brooks.

69. Throughout the entirety of this episode and use of force on Mr. Brooks, he never resisted, never was told he was under arrest or detainment by Officer Comfort, and never acted with threatening behavior or speech towards Officer Comfort or anyone else at the scene.

70. Mr. Brooks was later criminally charged with: Assault and Battery Upon a Police Officer, Resisting an Officer, Obstructing an Officer, Assault and Battery, and Threatening an Act of Violence (CF-2020-1833; Tulsa County District Court).

71. However, on March 1, 2021, *all criminal charges against Plaintiff were dismissed, with costs to the state.*

72. Mr. Brooks filed suit against Officer Comfort and the City of Tulsa. The United States District Court for the Northern District of Oklahoma denied Officer Comfort's Motion for Summary Judgment with respect to the excessive force claim, holding that a reasonable jury "could conclude that Officer Comfort employed more force than objectively reasonable under the circumstances." In finding that the right at issue was clearly established, the Court held that a reasonable juror could conclude that, "at the time that Officer Comfort struck Mr. Brooks and attempted the carotid restraint hold, Mr. Brooks was effectively subdued and did not pose a threat."

8

■ Gates Incident

73.    On November 17, 2021, numerous TPD Officers executed a search warrant at a local medical laboratory, Alpha Medical Laboratory, LLC.

74.    Alpha was owned by a man named Robert Gates.

75.    The search warrant, which was later determined to be based on numerous falsehoods perpetrated by TPD Detective Samantha Ramsey, permitted TPD Officers to remove several pieces of expensive lab equipment from Alpha because they were allegedly (but not actually) stolen.

76.    During the execution of the search warrant, several TPD Officers, including TPD Officer Don Holloway, forcefully took Robert Gates' wife, Rita Gates, to the ground and handcuffed her.

77.    Mrs. Gates was a petite woman in her late 60s who was unarmed, compliant, not resisting, and not attempting to flee. Indeed, Mrs. Gates didn't even know why the Officers had stormed into the lab in riot gear with their guns drawn.

78.    Mrs. Gates' son, Julio Melendez, was also handcuffed during the incident. While handcuffed, Mr. Melendez witnessed the other Officers manhandle his small, elderly mother, and began to protest the unreasonably excessive force they used.

79.    In response to Mr. Melendez's complaints, TPD Officer Shockley used a leg sweep to take the handcuffed and compliant Mr. Melendez to the ground.

80.    Mr. Melendez was then arrested for resisting arrest and obstruction, charges which were later dropped.

81.    Mrs. Gates was arrested for embezzlement by an employee and conspiracy to commit a felony, charges which were later dropped.

■ Officer-Involved Shooting Incidents

9

82.    TPD Officers have also used unnecessarily excessive deadly force on numerous occasions in recent years. *See, e.g., Rucker v. City of Tulsa, et al.,* Case No. 23-CV-237-CVE-MTS (N.D. Okla. 2023); *Lunsford v. City of Tulsa, et al.,* Case No. 22-CV-347-CVE-JFJ (N.D. Okla. 2022); *Delaney v. City of Tulsa, et al.,* Case No. 21-CV-544-GAG-SH (N.D. Okla.).

83.    The City reached settlements with the plaintiffs in *Lunsford* and *Delaney.*

84.    In *Rucker,* the district court denied motions for summary judgment filed by two of the officers involved, TPD Officers Will Mortensen[1] and Michael Snyder, holding that a reasonable juror could find that the force they used was excessive. Officers Mortensen and Snyder filed interlocutory appeals based on qualified immunity, which are pending before the Tenth Circuit.

<u>CAUSES OF ACTION</u>

**CLAIM I**
**EXCESSIVE USE OF FORCE**
(Fourth Amendment; 42 U.S.C. § 1983)
(Defendant Comfort)

85.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 84, as though fully set forth herein.

86.    At the time of the complained of events, Plaintiff, as a free person, had a clearly established constitutional right under the Fourth Amendment to be secure in his person and free from unreasonable seizure through objectively unreasonable and excessive force to injure him and his bodily integrity.

87.    In the totality of the circumstances, Plaintiff was cooperative, compliant, in no way actively resisting or attempting to evade TPD by flight, and in no way posing any immediate threat to the safety of TPD officers, himself or others.

---

[1] Officer Mortensen was also a defendant in the *Wilkins* case. It was his use of force that the Tenth Circuit held was excessive. *See Wilkins,* 33 F.4th at 1274-75.

88.     Any reasonable police officer would have known of these rights at the time of the complained of conduct as they were clearly established at that time.

89.     The actions of Officer Hoftender, in forcefully slamming him to the ground and then grabbing him by the face and smashing his head and neck into the mirrored wall, were objectively unreasonable and excessive uses of force under the circumstances, and thereby violated the Fourth Amendment rights of Plaintiff.

90.     Officer Hoftender's use of force was also reckless, callous, and deliberately indifferent to Plaintiff's federally protected rights.

91.     Officer Hoftender unlawfully seized Plaintiff by means of objectively unreasonable, excessive physical force, thereby unreasonably restraining Plaintiff of his freedom and causing him multiple serious bodily injuries, as well as mental pain and anguish, and the damages alleged herein.

92.     As a proximate result of Officer Hoftender's unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial.

## CLAIM II

### Municipal Liability
### (City of Tulsa)

93.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 91, as though fully set forth herein.

94.     There is an affirmative link between the deprivation of Plaintiff's constitutional rights and TPD policies, practices and/or customs which the City promulgated, created, implemented and/or possessed responsibility for.

95.     The policies or customs include:

a. A failure to adequately train and/or supervise TPD officers, including Officer Hoftender, with respect to the Fourth Amendment rights of citizens.

b. A failure to adequately train and/or supervise TPD officers, including Officer Hoftender, with respect to the use of force on suspects, including suspects who are unarmed, compliant, do not pose a risk of safety to anyone, and/or subdued.

c. A failure to adequately train and/or supervise TPD officers, including Officer Hoftender, with respect to the *Graham* factors and relevant Supreme Court and United States Courts of Appeals opinions regarding the excessive use of force.

d. An established pattern, practice and custom of TPD officers using unreasonable force on suspects who are unarmed, compliant, do not pose a risk to the safety to anyone, and/or subdued.

96. Prior to the excessive use of force on Plaintiff, there have been numerous other instances of constitutional deficiencies within the TPD that the City was aware of, but failed to alleviate.

97. In deliberate indifference to the harm likely to result, the City took either no remedial action, or inadequate remedial action, in response to the prior pattern of tortious conduct by its officers. *See, e.g.,* ¶¶ 29-84, *supra.*

98. Thus, the City has created, tolerated and maintained long-standing, unconstitutional department-wide customs, law enforcement related policies, procedures and practices, and failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference with respect to the use of force.

99. The deliberately indifferent training and supervision provided by Defendant City resulted from a conscious or deliberate choice to follow a course of action from among various

12

alternatives available to Defendant City and were also moving forces behind the violation of Plaintiff's civil rights and the resulting injuries alleged herein.

100.    As a direct result of Defendants' unlawful conduct, Plaintiff has suffered serious actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial.

WHEREFORE, based on the foregoing, Plaintiff prays this Court grant him the relief sought, including but not limited to actual, compensatory and punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

<u>/s/Daniel E. Smolen</u>
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
Smolen & Roytman, PLLC
701 S. Cincinnati Ave.
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669

**Attorneys for Plaintiff**